ROBERT EWING Receiver, *v.* W. COFFMAN AND WIFE..

CHANCERY PLEADINGS AND PRACTICE. *Life insurance. Re-insurance. Mortgage. Premiums. Set-off.* A person took out a policy on his life in favor of his wife in a foreign insurance company doing business in this State, from which company he afterwards borrowed money, and secured it by a mortgage on land. He paid the premiums for several years, until the company assigned its assets to another insurance company under an agreement for re-insurance, when he surrendered the policy and took another in its place in the latter

Ewing *v.* Coffman and Wife.

company. Afterwards a general creditor's bill was filed in this State to administer the assets of the first company as an insolvent corporation, under which a receiver was appointed to collect the assets of the company. Upon a bill filed by the receiver to foreclose the mortgage for borrowed money, it was held that the original contract of insurance was terminated by the surrender of the first policy, and that the debtor had no right of action nor of set-off against the first company for premiums paid or otherwise.

FROM KNOX.

Appeal in error from the Chancery Court at Knoxville. W. B. STALEY, Ch.

W. M. BAXTER for complainant.

LOGAN & LUCKEY for defendant.

COOPER, J., delivered the opinion of the court.

The St. Louis Mutual Life Insurance Company was incorporated by the State of Missouri in the year 1866, and shortly afterwards commenced doing business in this State, and, in compliance with our insurance laws, deposited with the proper State officer at Nashville the amount of public securities required by law "as security for risks taken by citizens of this State." It afterwards issued a number of policies of insurance on the lives of the citizens of this State, and among others, on December 23, 1869, a policy on the life of the defendant, Wm. Coffman, for the benefit of his wife, in the sum of $10,000, reduced in June, 1873, by mutual consent, to $5,000. Coffman paid the premiums of insurance on this policy until September, 1874, when he surrendered it, and received in lieu a

policy for the same amount in the Columbia Life Insurance Company, a company also incorporated by the State of Missouri. And he paid the premiums on this policy until July, 1876. The St. Louis Mutual Life Insurance Company made loans and investments of money in this State, and, among other persons, it loaned to Coffman on May 2, 1872, $2,000 for five years, which sum, with interest, was secured by a mortgage of land made by Coffman and wife.

In the month of March, 1869, the Legislature of the State of Missouri passed an act for the regulation of life insurance companies, and appointed a superintendent of insurance to see that the regulations were complied with. The superintendent was authorized to examine into the affairs of the life insurance companies, and whenever, "upon any such examination," it appeared to him that any company created by or organized under the laws of the State of Missouri was insolvent, "or that its condition is such as to render its further proceedings hazardous to the public, or those holding policies," it was made his duty to file a petition to enjoin the company from doing business. The act also required all such companies to keep their reserve on a $4\frac{1}{2}$ per cent. basis. On October 6, 1873, the superintendent of insurance did file a petition, under this act, against the St. Louis Mutual Life Insurance Company, but this petition was dismissed December 17, 1873, with the consent of the court, upon the company entering into an agreement with the Mound City Life Insurance Company for a re-insurance of its policies. This agreement was made December 13, 1873,

and consummated January 14, 1874. By it the St. Louis Mutual Company agreed to transfer to the Mound City Life Insurance Company all of its assets "of whatsoever name and nature," that company undertaking to re-insure all its risks and pay all its debts. The Mound City Life Insurance Company afterwards changed its name to the St. Louis Life Insurance Company, and again to the Columbia Life Insurance Company. In October, 1876, and February, 1877, the superintendent of insurance filed separate petitions against the St. Louis Mutual Life Insurance Company and the Columbia Life Insurance Company, in which, in February and October, 1877, final decrees seem to have been rendered in effect dissolving both corporations. The referee appointed to examine into the condition of the Columbia company, and whose printed report is made a part of the record now before us, winds up by saying: " I don't believe that at any time since January, 1874, the company has been perfectly solvent."

In the meantime, on August 11, 1875, a bill was filed in the chancery court at Nashville by several of the policy holders of the St. Louis Mutual Life Insurance Company, for themselves and all other creditors of the company, to attach the bonds deposited at Nashville, and all the other property and effects of the company in this State, and to wind up the business of the company, ascertain its debts, and appropriate its assets in this State, upon the ground that it was an insolvent corporation, and had ceased to use its franchises. The Mound City Life Insurance Com-

pany by its then name of the St. Louis Life Insurance Company was made a party defendant, and the contract of December 13, 1873, was attacked as being *ultra vires* of the corporate power of the St. Louis Mutual Company, and void. The companies appeared and answered, the St. Louis Life Insurance Company under its new name of the Columbia Life Insurance Company. Such proceedings were had in this cause that the contract of December 13, 1873, was held to be *ultra vires* and void, the St. Louis Mutual Life Insurance Company was declared to be insolvent as of that date, and the assets of that company in this State were ordered to be administered as a trust fund for the benefit of its creditors in this State. It was also decided that there was no such fraud shown as would avoid contracts made by the policy-holders with the company *ab initio*, that mere insolvency of one contracting party is no ground for avoiding or terminating a contract, and that the rights of the policy-holders must date from December 13, 1873, when there was a positive breach of its contracts by the company by its attempt to assign all its assets, and *cesser* to use its franchises. The point was made by the policy-holders that they were entitled to recover the premiums paid, with interest. But the court held that this would be manifestly unjust to the company, and unequal as between the policy-holders, and that the recovery should be the equitable value of the policy at the time of the breach, namely December 13, 1873. The equitable value of a policy has been defined by the Supreme Court of the United States to be the

difference between the cost of a new policy and the present value of the premiums yet to be paid. The English courts say it is the sum which would be required in each particular case to purchase a policy of the same amount at the same premium in a solvent office. The rule is, in 'substance, the same, limiting the recovery to the reserve fund which the company ought to have had in hand at the time, with such addition, if any, as · may be required in a particular case to meet an exceptional change of bodily health· The same measure of recovery has been adopted by this court where there has been a breach of a life-policy by the company, or a termination of it by law or contract: *Crawford* v. *Ætna Ins. Co.,* 1 Leg. Rep., 130; *Insurance Co.* v. *Matthews,* 8 Lea, 499, 505.

The decision of the chancellor of the rights of the parties under the general creditor's bill at Nashville, made in May, 1877, is reported in *Smith* v. *St. Louis Mutual Life Ins. Co.* 2 Tenn. Ch., 727. The decree was affirmed by this court upon appeal, but the opinion has not been reported.

In the meantime Coffman and others filed separate bills at Knoxville against the St. Louis Mutual Life Insurance Company and the Columbia Life Insurance Company, as creditors of the companies, and attaching the assets of the St. Louis Mutual Company in the form of debts due to it and property mortgaged to secure the debts in this State. Thereupon an amended and supplemental bill was filed in the general creditors' cause at Nashville to enjoin the further prosecution of these separate suits. Such proceedings were

had in said cause that the chancellor did enjoin the prosecution of separate suits whereby the creditors were required to bring their claims into the one case for adjustment. The decree was also, upon appeal, affirmed by this court. The decision of the chancellor is reported in 3 Tenn. Ch., 503, and of this court in 6 Lea, 564. To the same effect is *Leipold* v. *Murray*, 7 Lea, 128.

After these decisions on January 14, 1879, Robert Ewing was, by an order made in the general creditors' suit, appointed receiver to collect and hold the funds of the insolvent corporation, and of the "Mound City Life, *alias* St. Louis Life, *alias* Columbia Life Insurance Company," wherever situated in the State of Tennessee, and for this purpose he was authorized " to bring any and all suits necessary to collect what is due and owing said companies from any party in the State of Tennessee." The present bill was accordingly filed against Coffman and wife on December 12, 1879, to collect the debt due from him for borrowed money as aforesaid, and, for this purpose, to foreclose the mortgage made to secure it. The bill, curiously enough, purports to be in the name of the two insurance companies for the use of the receiver, as well as in the name of the receiver, but the cross-bill is against the receiver alone, and the rights of the parties turn upon the extent of relief to which Coffman is entitled as against the receiver.

Coffman admits the execution of his notes for borrowed money and the annual interest thereon, and of the mortgage or trust deed to secure their payment

as charged, and there is no controversy over the amount of the balance of the debt unpaid. He insists, as did the policy-holders in the general creditors' bill, upon the right to recover the premiums paid with interest, and to have the same set off against his indebtedness for borrowed money. The debt sued on is Coffman's individual debt, and the equitable value of the policy on his life belongs to his wife: *Gosling* v. *Caldwell*, 1 Lea, 454: *Scobey* v. *Waters*, 10 Lea, 551. The two debts are therefore not mutual, in this view, and cannot be set off against each other. The only ground upon which the set-off can be claimed is that the contract of insurance was void *ab initio*. But the necessary parties are not before the court upon the cross-bill to make such a defense, nor is there a particle of proof to sustain the defense if it could be made. All that the answer sets up is that false representations as to the solvency of the insurance company, and the reliability of its officers were made to him by the agent of the company when he took out his policy. But, even if such general allegations can be noticed at all, there is no proof of any representations whatever. The mere insolvency of the company at that time, if there were any such proof, would not avoid the policy, for the obvious reason that the pecuniary condition of a party to a contract is no ground for rescinding it, much less for treating it as void *ab initio*. Very few contracts would stand if such a rule existed. Even full knowledge of insolvency by one of the parties will make no difference: *First National Bank* v. *McClung*, 7 Lea, 492; *Comfort*

v. *McTeer*, 7 Lea, 652. The St. Louis Court of Appeals in a suit against the very company now before us held that a policy holder could not sue the company for a breach of the contract upon the ground of its insolvency, but must wait until the life had fallen in: *Bearden* v. *St. Louis Mutual Ins. Co.*, 3 Mo. App. Cas., 248, 254. The District Judge of the United States at St. Louis made a decision to the same effect. Both courts cited and relied on the English case of *King* v. *Accumulative Life Fund*, 3 C. B. N. S., 151; S. C., 5 Big. Ins. Cas., 635. These cases are commented on in 2 Tenn. Ch., 739. The principle on which they rest is undoubtedly correct, but ceases to apply, under the law of this State, when the debtor corporation commits such an overt act of insolvency as will authorize the courts to impound its assets as a trust fund for all its creditors.

Such an act was committed, as this court has held, when the St. Louis Mutual Life Insurance Company undertook to make a transfer of all its assets, and ceased to do business. From that time its property became a trust fund for the benefit of creditors *pro rata* upon a bill filed for the purpose, and such a bill was filed on August 11, 1875, at Nashville. From the filing of that bill, the right of set-off, or rather of subsequently acquiring the right of set-off at once ceased: *Smith* v. *Mosby*, 9 Heis., 501; *Lanier* v. *Gayoso Sav. Inst.*, 9 Heis., 506; *Mosby* v. *Williams*, 5 Heis., 278. Of course any claim of debt arising in favor of Coffman by the payment of premiums after the 11th of August, 1875, could no longer

be set off against a claim then due by him to the
company. To that extent he must go into the gen-
eral creditors' suit, and establish his claim for *pro
rata* distribution. And the premiums paid to the Co-
lumbia Life, in any of its three names, could not be
allowed at all. For this court and the courts of
Missouri have held that the transfer of assets to that
company by the St. Louis Mutual was *ultra vires* and
void as to those policy-holders of the latter company
who never assented to the transfers.

The courts of both States have also held that the
policy-holder of the first company might, however,
enter into a new contract with the other company out
and out if he saw proper so to do, and thereby lose
all remedy against the first company. Such a new
contract was made by the defendant, Coffman, and so
far as appears, with full knowledge of the facts. The
old contract was thereby terminated, and no right of
action remained thereon, or based upon the fact that
it had existed. The answer and cross bill moreover were
not filed until March 31, 1880, more than six years
after the act of insolvency of the St. Louis Mutual
Company. The right of action growing out of the
original contract, if any existed, is gone except by the
transfer of the original suit of Coffman and wife by
injunction to the court at Nashville.

Even if the insurance companies were before the
court as parties to the cross bill, as they are not, so
as to give the court jurisdiction to set aside the con-
tracts of insurance as void for fraud, there is no evi-
dence to show fraud. The act of the Missouri Legis-

lature of March, 1869, does not say anywhere that a contract with a company shall be annulled by a failure of the company to keep up its reserve on the basis prescribed. Such a provision would have been disastrous to the policy-holder, and was of course never for a moment contemplated. It only provides for the commencement of judicial proceedings by the superintendent in certain contingencies. Obviously, therefore, the only right of action which can possibly exist, if indeed there can be any right of action at all, is for the equitable value of the policy on December 13, 1873, and that in favor of Coffman's wife, which ought only to be ascertained in the suit to which the company and other creditors are parties.

The report of the Referees should be set aside, and the chancellor's decree affirmed with costs.

Judges COOKE and TURNEY dissent.